# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br>v.<br>MICHELLE LOPEZ,<br><br>              Defendant. | CASE NO. 13CR2092 WQH<br><br>ORDER |
|---|---|

HAYES, Judge:

The matters before the Court are the following motions filed by the Defendant Michelle Lopez: 1) the motion to suppress evidence under the Fourth Amendment (ECF No. 32-2); and 2) the motion to suppress evidence under the Fourth Amendment and to suppress evidence under the Fifth amendment (ECF No. 42).

## BACKGROUND FACTS

On May 23, 2013, at approximately 11:57 a.m., Defendant applied for admission to the United States at the San Ysidro Port of Entry as the driver of a green Honda Accord. Defendant was referred to secondary and a dog alerted to the dashboard of the vehicle. Ten packages of cocaine were discovered in the heater core of the vehicle. Defendant was placed under arrest. At the time of her arrest, three electronic devices were seized from the Defendant – a Motorola clutch i465, an iPhone, and an iPad.

At approximately 2:00 p.m., Special Agent Trammell of Homeland Security Investigations responded to the border to investigate Defendant's arrest for drug smuggling. Agent Trammell obtained necessary reports, looked at the vehicle, and talked to the border patrol officers. Agent Trammell took possession of the two cell

phones and the iPad.  At approximately 4:33 p.m., Agent Trammell used a Cellebrite device to search the Motorola push-to-talk phone at the Port.  The process of searching the phone took about a minute.  The Cellebrite device uses software to capture data which has not been deleted and would be visible to any manual user, including contact lists, pictures, and text messages.  The Motorola push-to-talk phone was not password protected.  Agent Trammell testified that he did not immediately search the iPhone and the iPad as follows:

> Q [by counsel]: After Cellebriting the Motorola phone, did you immediately Cellebrite the other phone?
> A [Agent Trammell]: No, we did not.
> Q: Any why not?
> A: For one, they were password protected.
> Q: Okay.
> A: And then due to that fact we wanted to interview Ms. Lopez.

(ECF No. 47 at 9).

Around 6 p.m., Agent Trammell interviewed the Defendant.  Agent Trammell began the interview by asking Defendant for identifying information, including date of birth, parents' names, where she lived, and where she worked.  The agent advised Defendant of her *Miranda* rights.  Defendant invoked her right to counsel and the interview terminated.

Agent Trammell testified that another agent "guessed" the password to the iPhone and the iPad after the interview terminated.  (ECF No. 47 at 10).  Agent Trammel testified:

> Q [by counsel]: And did he tell you how he was able to guess the password?
> A [Agent Trammell]: It was the defendant's birthday.

*Id.*  Agent Trammell used the Cellebrite device to extract data from Defendant's iPhone. Agent Trammell generated two reports of data from the iPhone which contain contacts, test messages, a calendar, and other personal information.  Agent Trammell then used the Cellebrite to extract information from Defendant's iPad.  Agent Trammell burned the information from the Defendant's three electronic devices to a disk and provided them to intake the next morning.

- 2 -

13CR2092WQH

1   Defendant was charged with importation of cocaine.

2   On June 13, 2013, Defendant was released on bond.

3   On September 3, 2013, Defendant filed a motion to compel discovery and to
4   suppress evidence. (ECF No. 32).

5   On November 7, 2013, the Court held an evidentiary hearing on the motion to
6   suppress evidence. Agent Trammell testified at the hearing. (ECF No. 47).

7   On November 26, 2013, Defendant's request to modify conditions of pretrial
8   release to allow travel to Mexico was granted. (ECF No. 41).

9   On November 27, 2013, Defendant filed a second motion to suppress evidence
10  under the Fourth Amendment and suppress statements under the Fifth Amendment.
11  (ECF No. 42).

12  On December 16, 2013, the Court held a hearing at which Defendant was not
13  present. (ECF No. 46). The Court ordered a no bail bench warrant.

14  On January 2, 2014, the Court held a hearing at which Defendant was not present.
15  The Court subsequently vacated the pending trial date and an arrest warrant issued.

16  On January 8, 2014, a superseding indictment was filed charging Defendant in
17  Count 1 with importation of cocaine and in Count 2 with failure to appear in connection
18  with felony charges. (ECF No. 53).

19  On September 12, 2016, Defendant was arrested. (ECF No. 59).

20  **ANALYSIS**

21  **1) Motion to suppress evidence under the Fourth Amendment** (ECF No. 32-2)

22  Defendant asserts that the warrantless search of her cellular phones and iPad does
23  not fall within the border search exception. Defendant contends that the search in this
24  case was intended to enforce the criminal laws and not to protect the borders from
25  contraband. Even using the border search exception to the warrant requirement,
26  Defendant asserts that the agent lacked reasonable suspicion for the overbroad search.

27  The Government contends that the warrantless search of Defendant's cellular
28  phones and iPad at the Port of Entry after her arrest crossing at the port of entry into the

1  United States with controlled substances falls within the border search exception to the
2  warrant requirement.  The Government contends that this border search was not an
3  intrusive forensic examination and did not require reasonable suspicion.  The
4  Government asserts that the Cellebrite search in this case gained only the access to files
5  that a manual user could access.  Finally, the Government contends that the search in
6  this case was clearly supported by reasonable suspicion.

7  In *United States v. Cotterman*, 709 F.3d 952 (9th Cir. 2013) (en banc), *cert.
8  denied*, 134 S. Ct. 899 (2014), the Court of Appeals "consider[ed] the reasonableness
9  of a computer search that began as a cursory review at the border but transformed into
10  a forensic examination of Cotterman's hard drive." *Id.* at 958.  Cotterman presented
11  at the port of entry for admission in to the United States, and a TECS hit indicating that
12  Cotterman was a sex offender resulted in his referral to secondary inspection.  Border
13  agents retrieved two laptop computers and three digital cameras from Cotterman's
14  vehicle and found "what appeared to be family and other personal photos, along with
15  several password protected files." *Id.* at 959.  The agents allowed Cotterman to leave
16  the border but retained the laptops and a digital camera.  The agents then drove the
17  laptops and the camera 170 miles to a computer forensic examiner.  That same evening,
18  the examiner found images of child pornography within the unallocated space of the
19  laptop.  Agents contacted Cotterman to request assistance to access password-protected
20  files on the laptop.  Cotterman agreed to provide assistance but did not show up.  Later,
21  the examiner "managed to open twenty-three password protected files on Cotterman's
22  laptop. The files revealed approximately 378 images of child pornography." *Id.* at 960.
23  Cotterman moved to suppress the evidence from the warrantless search of his laptop and
24  the fruits of that evidence.  The district court granted the motion to suppress.

25  On appeal, the Court of Appeals stated,

26  The broad contours of the scope of searches at our international borders
    are rooted in "the long-standing right of the sovereign to protect itself by
27  stopping and examining persons and property crossing into this country."
    *Ramsey*, 431 U.S. at 616, 97 S.Ct. 1972. Thus, border searches form "a
28  narrow exception to the Fourth Amendment prohibition against
    warrantless searches without probable cause." *Seljan*, 547 F.3d at 999

> (internal quotation marks and citation omitted). Because "[t]he Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border," *United States v. Flores–Montano*, 541 U.S. 149, 152, 124 S.Ct. 1582, 158 L.Ed.2d 311 (2004), border searches are generally deemed "reasonable simply by virtue of the fact that they occur at the border." *Ramsey*, 431 U.S. at 616, 97 S.Ct. 1972.
>
> This does not mean, however, that at the border "anything goes." *Seljan*, 547 F.3d at 1000. Even at the border, individual privacy rights are not abandoned but "[b]alanced against the sovereign's interests." *United States v. Montoya de Hernandez*, 473 U.S. 531, 539, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985). That balance "is qualitatively different ... than in the interior" and is "struck much more favorably to the Government." *Id*. at 538, 540, 105 S.Ct. 3304. Nonetheless, the touchstone of the Fourth Amendment analysis remains reasonableness. *Id*. at 538, 105 S.Ct. 3304. The reasonableness of a search or seizure depends on the totality of the circumstances, including the scope and duration of the deprivation. *See United States v. Jacobsen*, 466 U.S. 109, 124, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984); *see also United States v. Duncan*, 693 F.2d 971, 977 (9th Cir.1982).

709 F.3d at 960. The Court of Appeals examined the search of Cotterman's laptop and explained, "the legitimacy of the initial search of Cotterman's electronic devices at the border is not in doubt. . . . [W]e have approved a quick look and unintrusive search of laptops . . . Had the search of Cotterman's laptop ended with Officer Alvarado, we would conclude it was reasonable even without particularized suspicion. But the search here transformed into something far different. The difficult question we confront is the reasonableness, without a warrant, of the forensic examination that comprehensively analyzed the hard drive of the computer." *Id.* at 960-61. The Court of Appeals explained,

> It is the comprehensive and intrusive nature of a forensic examination—not the location of the examination—that is the key factor triggering the requirement of reasonable suspicion here. *See Cotterman*, 637 F.3d at 1086–87 n. 6 (B. Fletcher, J., dissenting) (recognizing that "[a] computer search in a forensic lab will always be equivalent to an identical search at the border. The duration of a computer search is not controlled by where the search is conducted. The duration of a computer search is controlled by what one is looking for and how one goes about searching for it."). The search would have been every bit as intrusive had Agent Owen traveled to the border with his forensic equipment. Indeed, Agent Owen had a laptop with forensic software that he could have used to conduct an examination at the port of entry itself, although he testified it would have been a more time-consuming effort. To carry out the examination of Cotterman's laptop, Agent Owen used computer forensic software to copy the hard drive and then analyze it in its entirety, including data that ostensibly had been deleted. This painstaking analysis is akin to

> reading a diary line by line looking for mention of criminal activity—plus looking at everything the writer may have erased.

*Id*. at 962-63. The Court of Appeals described the computer forensic software program in *Cotterman* which found incriminating files in the unallocated space where the computer stores files that the user ostensibly deleted:

> Agent Owen used a software program called EnCase that exhibited the distinctive features of computer forensic examination. The program copied, analyzed, and preserved the data stored on the hard drive and gave the examiner access to far more data, including password-protected, hidden or encrypted, and deleted files, than a manual user could access.

*Id.* at 963 n. 9. The Court of Appeals concluded that the computer forensic software program "intrude[d] upon privacy and dignity interests to a far greater degree than a cursory search at the border" and "required a showing of reasonable suspicion." *Id*. at 966, 968. The Court of Appeals concluded that the totality of the circumstances supported a reasonable suspicion for the examination of Cotterman's electronic devices and reversed the order of the district court suppressing evidence.

In this case, searches of Defendant's electronic devices with the Cellebrite device for evidence of criminal activity took place at the border within a few hours of her arrest as the sole occupant of a vehicle containing a substance which field tested positive for cocaine. The Cellebrite device used software to extract data from the electronic devices, downloaded the data from the electronic devices, and printed out a report. The Cellebrite device provided no access to information encrypted, deleted or password protected. Applying the ruling in *Cotterman* to the facts in this case, the Court concludes that the search using the Cellebrite device did not exhibit the "distinctive features of a computer forensic examination." 709 F.3d at 963 n.9. The non-forensic scan of the electronic devices accessed information available to any manual user examining the electronic devices. In this case, the agents used the Cellebrite device to access information otherwise available to any manual user of Defendant's devices. The fact that the iPhone and the iPad were password protected using the Defendant's date of birth did not transform the Cellebrite search into the type of computer forensic examination used in *Cotterman*. Even assuming, however, that the password protection

on the iPhone and the iPad required additional constitutional protections, any requirement for reasonable suspicion would have been met in this case. The agents were investigating the smuggling of controlled substances into the United States. The agents had a "particularized and objective basis for suspecting" that the devices searched would contain evidence of criminal activity. *United States v. Cortez*, 449 U.S. 411, 417 (1981). Under the totality of the circumstances, the Court concludes that the search in this case did not violate Defendant's rights under the Fourth Amendment.[1]

After *Cotterman*, the United States Supreme Court decided *Riley v. California*, 134 S. Ct. 2473 (2014). In *Riley*, the Supreme Court concluded that a warrant is generally required before a search of a cell phone within the interior and away from any international border, "even when a cell phone is seized incident to arrest." *Id.* at 2493. The Supreme Court stated, "Our answer to the question of what police must do before searching a cell phone seized incident to an arrest is accordingly simple – get a warrant." *Id.* at 2495. This Court concludes that the decision in *Riley* is not clearly irreconcilable with *Cotterman* and does not narrow the limits of a border search. *See United States v. Caballero*, 178 F. Supp. 3d 1008 (S.D. Cal. April 4, 2016) (same result); and *United States v. Hernandez*, Case No. 15cr2613-GPC (S.D. Cal. February 8, 2016) (same result).

Finally, the arrest and search in this case took place on May 23, 2013, prior to *Cotterman* and *Riley*. "Evidence should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge that the search was unconstitutional under the Fourth Amendment." *United States v. Schesso*, 730 F.3d 1040, 1050-51 (9th Cir. 2013). (internal quotations and citations omitted). At the time of the search, there was no applicable law which would properly charge Agent Trammell with knowledge that using the Cellebrite device to search Defendant's cellular phones and iPad at the border after her arrest for drug smuggling

---

[1] Characterizing the search as " to gather evidence" does not change an otherwise valid border search into a Fourth Amendment violation. (ECF No. 42-1 at 5) Searches at the border are reasonable to investigate criminal activity and to gather evidence.

1 was unconstitutional under the Fourth Amendment. "Reasonableness remains the touchstone. . ." *Cotterman*, 709 F.3d at 967. Balancing the location and timing of the search, the limited nature and intrusiveness of the search, and the ample evidence of criminal activity, this Court concludes that the warrantless border search of the Defendant's electronic devices in this case was reasonable.

**2. Motion to suppress evidence under the Fourth Amendment and to suppress evidence under the Fifth Amendment** (ECF No. 42)

Defendant contends that the Court must suppress her statements to Agent Trammell and the resulting search of her electronic devices due to his failure to comply with *Miranda v. Arizona*, 384 U.S. 436 (1966). Defendant asserts that Agent Trammell was unable to search two of the electronic devices because of the password protection, that Agent Trammell obtained Defendant's date of birth through questioning prior to *Miranda* warnings, and that the agents used Defendant's date of birth after the interview terminated to bypass the password protection on Defendant's devices in order to search for incriminating information. Defendant asserts that Agent Trammell's questions amounted to interrogation likely to elicit an incriminating response under these circumstances. Defendant contends that any evidence found in the search of her cellular phones and iPad, must be suppressed as the fruit of unlawful questioning in violation of her Fifth Amendment rights under the United States Constitution.

The Government contends that law enforcement already had Defendant's date of birth from a number of sources, such as her driver's license and fingerprint checks. The Government asserts that "there is simply no reason to suppress answers to biographical questions that have otherwise long been found acceptable." (ECF No. 45 at 2).

In *United States v. Williams*, 2016 WL 7046754, (9th Cir. December 5, 2016), the Court of Appeals explained,

> The so-called "booking questions exception" exempts "from Miranda's coverage questions to secure the biographical data necessary to complete booking or pretrial services." *Pennsylvania v. Muniz*, 496 U.S. 582, 601, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990) (plurality opinion) (quotation marks omitted) (concluding that the answers to questions regarding the defendant's name, address, height, weight, eye color, date of birth, and

>current age were admissible in the absence of Miranda warnings); . . .. Because such questions "rarely elicit an incriminating response, routine gathering of biographical data does not constitute interrogation sufficient to trigger constitutional protections." *United States v. Gonzalez–Sandoval*, 894 F.2d 1043, 1046 (9th Cir. 1990).

*Williams*, 2016 WL 7046754 at *2. "If, however, the questions are reasonably likely to elicit an incriminating response in a particular situation, the exception does not apply." *United States v. Mata-Abundiz*, 717 F.2d 1277, 1280 (9th Cir. 1983).

>Ordinarily, the routine gathering of background, biographical data will not constitute interrogation. Yet we recognize the potential for abuse by law enforcement officers who might, under the guise of seeking "objective" or "neutral" information, deliberately elicit an incriminating statement from a suspect. The test is objective. The subjective intent of the agent is relevant but not conclusive. The relationship of the question asked to the crime suspected is highly relevant.

*Id.* (citations omitted).

In this case, the Agent Trammell obtained biographical information at the start of the interview, including her date of birth. Defendant's birthdate is "biographical data necessary to complete booking or pretrial services." *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990). The question of Defendant's date of birth had no relationship to the crime suspected. Defendant was suspected of importing controlled substances into the United States and Agent Trammell did not have reason to suspect that asking the Defendant her date of birth "was reasonably likely to elicit an incriminating response." *Booth*, 669 F.2d at 1238. *Cf. Williams,* 2016 WL 7046754 at *3 ("[W]e hold only that when a defendant charged with murder invokes his *Miranda* rights, the government may not in its case-in-chief admit evidence of the prisoner's unadmonished responses to questions about his gang affiliation."); *United States v. Henley*, 984 F.2d 1040, 1042 (9th Cir. 1993) ("[W]hile there is usually nothing objectionable about asking a detainee his place of birth, the same question assumes a completely different character when an INS agent asks it of a person he suspects is an illegal alien.").

In addition, there was no evidence presented in this case that the agents used the Defendant's answers to the booking questions to obtain incriminating evidence. Agent Trammell testified at the evidentiary hearing that Special Agent Zach Goldman

1 "guessed the password." (ECF No. 47 at 10). There is evidence that Agent Goldman used Defendant's date of birth to guess her password and no evidence that Agent Goldman obtained her date of birth from Defendant's statement in the interview. Under the facts of this case, Defendant's date of birth was biographical information readily available from a number of sources at time of her arrest.

Under the facts of this case, questions regarding the Defendant's date of birth prior to *Miranda* warnings involved only routine booking information and did not subject the Defendant to interrogation in violation of her Fifth Amendment rights. The Court concludes that there was no Fifth Amendment violation.

IT IS HEREBY ORDERED that 1) the motion to suppress evidence under the Fourth Amendment (ECF No. 32-2) is denied; and 2) the motion to suppress evidence under the Fourth Amendment and to suppress evidence under the Fifth Amendment (ECF No. 42) is denied.

DATED: December 20, 2016

*William Q. Hayes*
**WILLIAM Q. HAYES**
United States District Judge